INDUSTRIAL DEVELOPMENT
AUTHORITY OF KANSAS
CITY, Appellant,

v.

STATE TAX COMMISSION OF MISSOURI, Ralph N. Smith, Van E. Donley, and Robert E. Coleman, Respondents.

No. WD 43836.

Missouri Court of Appeals,
Western District.

Jan. 8, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 5, 1991.

Jerome Wallach, St. Louis, W.H. Bates, Kansas City, for appellant.

William J. Gnefkow, Kansas City, for respondents.

Before GAITAN, P.J., and TURNAGE and KENNEDY, JJ.

GAITAN, Presiding Judge.

This appeal involves the judicial review of a decision and order of the State Tax Commission (STC) in a property assessment appeal. The taxpayer, and appellant herein, is the Industrial Development Authority of Kansas City. The taxpayer claims that STC failed to equalize its property at the true and correct average level of assessment in Jackson County in that the STC's assessment was based on an appraisal ratio study instead of the sales ratio study advocated by appellant.

The appellant has stated three reasons it believes the STC and the trial court which upheld the STC erred. However, we believe the real issue is whether or not the STC's appraisal ratio study was proper and nondiscriminatory. We affirm.

## I. STANDARD OF REVIEW

This appeal involves application of revenue laws previously construed by the Supreme Court and therefore is properly before this Court. *Affiliated Medical Transp., Inc. v. State Tax Comm'n,* 741 S.W.2d 25, 27 (Mo. banc 1987). Our review of the STC decision is to determine whether or not it is supported by competent and substantial evidence upon the record as a whole, or whether it is arbitrary, capricious, unreasonable, unlawful, or in excess of its jurisdiction. *Evangelical Retirement Homes of Greater St. Louis, Inc. v. State Tax Comm'n,* 669 S.W.2d 548, 552 (Mo. banc 1984). Further, the proper method of valuation and assessment of property are delegated to the STC. *C & D Inv. Co. v. Bestor,* 624 S.W.2d 835, 838 (Mo. banc 1981). In reviewing the STC decision, the evidence must be considered in the light most favorable to the administrative body, together with all reasonable inferences which support it. If the evidence would support either of two opposed findings, the reviewing court is bound by the administrative determination. *Hermel, Inc. v. State Tax Comm'n,* 564 S.W.2d 888, 894 (Mo. banc 1978).

## II. THE ALTERNATIVE RATIO STUDIES

### A. STC's APPRAISAL RATIO STUDY

Counsel for the commission called James Follina, manager for the Ratio Study Section of the STC, to testify regarding the 1987 Jackson County assessment ratio study conducted by the commission. Follina is in charge of conducting annual ratio studies for the commission for all the taxing jurisdictions in the state. As project director for the 1987 Jackson County study, Follina developed the guidelines and procedures used, instructed personnel, supervised the process from beginning to end, and assured compliance with the procedures.

Mr. Follina explained how a random sampling computer program selected the parcels used in the 1987 Jackson County

study. After the parcel numbers for the study were selected at random, an appraiser located the parcels on a map. The appraiser then inspected and appraised each sample property. The appraiser had no access to the assessed values of the properties until after the appraisals were complete. The initial appraisals were put through a mathematical audit at the commission's offices in Jefferson City and were then sent to a review appraiser. The review appraiser determined if the value on the property record card prepared by the appraiser was a fair representation of value for the property. After the review by the review appraiser, the property record cards were reviewed by Mr. Unruh, the assistant manager of the ratio study for the commission.

The appraisers then met with county officials to acquire additional data. Follina analyzed this additional data to determine whether any changes were required in the appraisal.

The raw data, appraised values, and the respective assessed values for the sample parcels were analyzed statistically to extrapolate a number of inferences regarding the class of commercial property. The measures of central tendency for commercial property in Jackson County for 1987 were: mean ratio of 34.39 percent; median ratio of 32.04 percent; and weighted ratio of 31.04 percent. Follina testified that he used the median ratio to adjust an individual assessment.

Follina stated, and it was undisputed, that the International Association of Assessing Officers considers a ratio within ten percent of the statutory level to be within acceptable standards.

Timothy Beyer, the appraiser who valued the sample parcels for the 1987 Jackson County commercial ratio study, testified as follows. During August and September of 1987, Beyer worked for more than 20 days (8 hours per day) to complete his responsibilities of inspecting the properties and their respective neighborhoods and gathering information regarding these properties. Beyer relied on commission and county sales files, realtors and real estate brokers,

property managers, and anyone with information on the sample properties. Beyer submitted the finished appraisals to the commission for a mathematical audit after which they were sent to the review appraiser.

While Beyer admitted he relied on the commission's sale and rental files to obtain information for the appraisals, evidence of comparable rentals is admissible in valuing property for tax purposes. *Frontier Airlines, Inc. v. State Tax Comm'n,* 528 S.W.2d 943, 948 (Mo. banc 1975). He did not personally verify sales information from the commission sales file. On properties for which no specific sales information was available, he consulted with realtors and brokers familiar with the property regarding land values. Beyer testified that in his opinion as an expert appraiser, the final appraised values stated on the property record cards reflect the true value in money of the subject properties on January 1, 1987.

Alfred C. Thomas was the review appraiser. He reviewed all of Beyer's appraisals for conformance with appraisal procedures. After the review was completed, Thomas obtained the assessed values of the sample properties.

Thomas testified that he compiled and maintained the sales file on which Beyer relied for his appraisals. Thomas verified the data in the file and relied heavily on the Jackson County sales files as well. He made it a point not to include unreliable information in the file and noted that it is common practice to rely on sales data from other appraisers.

Thomas testified that the purpose of meeting with the county assessor is to hear the assessor's side and convey it to the commission. He stated that he has never tried to match the property values and assessments to achieve a particular ratio.

On cross-examination, Thomas testified that he did not know the people Beyer talked to when doing his appraisals and that that information could not be determined from the property record cards. Thomas noted that appraisal is not an exact science and that appraisal reports interpret-

ing specific data are glazed over with a layer of subjectivity. Thomas admitted that it is a tough job to appraise odd parcels and the appraiser can get to the point where he must pick a number based solely on his judgment.

Dr. D. Richard Madsen, professor of statistics at the University of Missouri–Columbia, testified concerning the statistical soundness of the commission's sampling procedure. A basic tenant of statistical theory is that a sample must be randomly selected. Without randomness, reliable inferences regarding the underlying population are seriously questionable. If a random sample is drawn from the entire population of commercial property there would tend to be a mix of different types of property in the sample close to the mix in the underlying population. Accordingly, Madsen testified that the key to accuracy in the commission study was the randomness of the selected properties. Dr. Madsen testified that the commission sampling procedures produced good randomness. He stated that randomness and representativeness are not interchangeable concepts. Randomness can be quantified mathematically, whereas representativeness is a more subjective concept.

Madsen testified that the same statistical rules would apply whether one is doing an appraisal or a sales study, including drawing a random sample. When the sample is drawn only from property which has sold that would be the only group for which inferences can be drawn, and those inferences do not necessarily indicate the assessment level of all the commercial property in the county.

## B. APPELLANT'S SALES RATIO STUDY

James T. Job, an appraiser called by appellant, testified that the sales used were distributed throughout Jackson County and were spread over a large price range. Job had never participated in a ratio study before and received no written instructions regarding this study. His only instructions for doing the study were verbal communications which he passed on to his associ-

ates. After eliminating a number of sales for various reasons, he arrived at a sample of 31 sales. He stated that it is a common practice among appraisers to utilize and rely on sales data gathered by other appraisers without personally verifying the data. He did not personally verify all the sales data used, but relied on others in his office as well as other appraisers. He did, however, personally supervise locating and verifying the sales selected.

Job testified he selected sales for the ratio study because they are an indication of the price of a property in the market for a sale which has actually occurred. The sales prices used in appellant's ratio study were unadjusted sales prices due to the close proximity of the sale in time to the appraisal date. Job stated that other factors for which adjustments would have been made were nullified by the exclusion of problem sales from the sample. The difference between using sales prices and appraisals is that appraised values are the value opinions of appraisers based on an analysis of market data, whereas sales values are specific market occurrences.

Appellant called Dr. Gerald Olson, professor of economics at the University of Missouri–Kansas City. Olson performed the statistical analysis for the sales study. The modified report gave the following measures of central tendency: mean of 18.-34 percent, median of 18.4 percent, and weighted ratio of 20.16 percent. Significantly, however, the samples used were not random. Although Olson did not test the samples for representativeness, he testified that he had no information whether systematic bias existed in the sample. Olson stated that he believed the 31 sales represented the proper ratio of assessed value for commercial and industrial property in Jackson County. On cross-examination, however, Olson admitted that there could be a problem with the study if the distribution of sold properties did not represent the distribution of properties in the underlying population. He also testified that the study is only as good as the sales information which he received from Job. If the

study contains systematic bias, one would not want to consider it.

Olson testified that, as an economist, he would rely on sales as a true reflection of the market, but the ideal situation would be to know both the sales price and the appraised value of the property.

Next, appellant called Dr. C. Chris Kukuk, an appraiser and consulting statistician. The thrust of Kukuk's testimony was that the commission ratio study was flawed because it used appraised values for the true value component of the ratio. The basis of this assertion is that a certain amount of subjectivity is inserted into the study during the appraisal process. Kukuk also discussed the concepts of bias, randomness, and representativeness of statistical samples. Kukuk stated that appraised properties which are randomly selected are a representative sample of all commercial property in Jackson County. Kukuk testified that if all the property in the population is susceptible to sale then the entire underlying population is reflected in a sales study. He believed that appellant's sales study is more reliable to determine the level of assessment in Jackson County.

On cross-examination, Kukuk admitted that certain types of property sell more often than others and that every commercial property in Jackson County did not have an opportunity to be included in appellant's sales study. Kukuk could not state that appellant's sample was representative of the underlying population. He further criticized the fact that the assessor was consulted in the appraisal stage of the commission study.

## III. CONCLUSION

It is clear that ratio studies are an acceptable method to establish the average level of assessment. *Savage v. State Tax Comm'n,* 722 S.W.2d 72, 75 (Mo. banc 1986). The undisputed testimony in this case infers that there are two criteria essential to a properly conducted ratio study: (1) sample properties must be representative of the underlying population in order to draw valid inferences regarding that population; and (2) the values used for the market and assessed valuations of each sample must be accurate.

The commission found that the STC study was representative of the underlying population of all commercial property in Jackson County for 1987. The sample for the commission study was randomly selected from the entire population of commercial property in the county for 1987, a process which assures that the sample selected is representative, thus closely tracking the actual distribution of the different types of commercial property in Jackson County.

The commission found that appellant's study was not representative of the entire class of commercial property in Jackson County for 1987. Its sample was selected from a small portion of the commercial sales which occurred in Jackson County from October, 1986, to February, 1987.

Further, the commission found that the valuation data used in the STC study was accurate and the record supports their conclusion on this point. We find no impropriety in the fact that the appraised values were discussed with the county assessor's office. No changes were made automatically as a result of these meetings.

The appellant's argument that the commission study is flawed because subjective judgments are made by the appraiser is without merit. The appellant's own sales study is a result of subjective judgments made by Job regarding which sales are valid or appropriate for use in its study. Additionally, the appellant's witnesses testified to the "human" element involved in the selection of sales.

The appellant made a number of objections regarding whether or not the commission study is a scientific or statistical study as set forth in Mo.Rev.Stat. § 536.070(11) (1986). The commission study is a compilation of reports whose final valuations are synthesized in a statistical analysis, even as the appellant's sales study is a compilation of sales information which is synthesized in a statistical analysis. Both the appraisal information and the sales information used in these studies result from subjective

judgments made by expert appraisers. The fact that subjective judgments are made during the compilation of the basic data does not render either study any less a statistical study.

 There is a presumption of validity and of good faith of taxing officials. There is also a presumption of correctness of assessments by the assessor, by the county board of equalization, and by the commission. *Hermel, Inc. v. State Tax Comm'n,* 564 S.W.2d 888, 895 (Mo. banc 1978); *Chicago, Burlington & Quincy Ry. v. State Tax Comm'n,* 436 S.W.2d 650, 656 (Mo. 1968); *May Dept. Stores Co. v. State Tax Comm'n,* 308 S.W.2d 748, 759 (Mo.1958); *Ulman v. Evans,* 247 S.W.2d 693, 697–98 (Mo.1952); *State ex rel. Thompson v. Bethards,* 320 Mo. 1164, 1169, 9 S.W.2d 603, 604 (banc 1928).

When the complainant comes forward with substantial evidence, both the procedural presumption of validity and good faith of taxing officials and the presumption of correctness by the respondent and county board of equalization are rebutted. Once evidence of unlawful discrimination is introduced, the presumption for the assessor ceases to exist. *Savage v. State Tax Comm'n,* 722 S.W.2d 72, 77 (Mo. banc 1986). However, even when rebutted, the complainant, as the moving party, has the burden of proof on the facts. *Cupples Hesse Corp. v. State Tax Comm'n,* 329 S.W.2d 696, 701–02 (Mo.1959); *Koplar v. State Tax Comm'n,* 321 S.W.2d 686, 693 (Mo.1959); *Michler v. Krey Packing Co.,* 363 Mo. 707, 716, 253 S.W.2d 136, 140 (1952). Here, the taxpayer has not met his burden to overcome these presumptions.

Last, the appellant attacks the commission as biased and prejudiced because its own staff conducted the study. However, the appellant introduces no evidence of bias or prejudice. A review of the transcript shows that the commissioners paid careful attention to the manner in which the ratio studies were conducted, and that the proceedings were conducted in accordance with fundamental principles of justice. *Savage,* 722 S.W.2d at 77. In the absence of clear and convincing proof we will not presume that the commission prejudged the evidence, abandoned their duties, or violated their oath of office. *Moore v. Board of Educ. of Springfield School Dist.,* 547 S.W.2d 188, 191–92 (Mo.App.1977).

As previously stated where either of two opposed findings is supported by the evidence, we are bound to accept the finding of the administrative body. *Hermel, Inc. v. State Tax Comm'n,* 564 S.W.2d at 894. We believe that the findings of the STC are supported by the record.

The judgment of the commission is affirmed.

All concur.